Case 1:18-cv-00621-MAG Document 5-10 Filed 02/08/19 Page 1 of 22 PageID #: 156

Case 2:23-cv-01698-AKK Document 1 Filed 10/16/18 Page 1 of 22

FILED

2018 Oct-16 AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

**EDUCATION CORPORATION OF AMERICA, VIRGINIA COLLEGE, LLC, and NEW ENGLAND COLLEGE OF BUSINESS AND FINANCE, LLC,**

                   **Plaintiffs,**

     **v.**

**UNITED STATES DEPARTMENT OF EDUCATION, and BETSY DEVOS, in her official capacity as Secretary of Education,**

                 **Defendants.**

**Civil Action No._____**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND APPOINTMENT OF RECEIVER

PLAINTIFFS EDUCATION CORPORATION OF AMERICA, VIRGINIA COLLEGE, LLC and NEW ENGLAND COLLEGE OF BUSINESS AND FINANCE, LLC (collectively, "ECA" or "Plaintiffs" or "Debtors"), by and through counsel, bring this Complaint seeking declaratory and injunctive relief and the appointment of a federal receiver ("Receiver") over all of the assets of ECA and state as follows:

### I. INTRODUCTION

1.     Plaintiffs bring this action seeking declaratory and equitable relief from this Court in order to enable Plaintiffs to fulfill their mission of educating approximately 20,000 students enrolled in their institutions without interruption or unnecessary disruption of the students' educational plans. Plaintiffs have recently experienced financial difficulties that have resulted in numerous lawsuits and threatened exercise of remedies from its creditors, including at least two pending actions to evict ECA's institutions from their leased premises, materially threatening

ECA's operations and its students' ability to complete their courses. ECA desires to implement a restructuring plan under the supervision and protection of the Court in connection with its request for declaratory judgment regarding its rights vis-à-vis the U.S. Department of Education. Plaintiffs seek a declaratory judgment that the restructuring plan contemplated by ECA, further described below, will not interfere with the access and eligibility of those certain institutions owned and operated by ECA that are expected to continue operating in the ordinary course under the restructuring plan, and the students attending those institutions, to benefits under Title IV of the Higher Education Act of 1965 (the "HEA"), including the ability to participate under the HEA student financial aid programs by any successor to ECA.  In that regard, Plaintiffs seek a declaration that the mere appointment of the Receiver with the scope of authority and powers proposed will not affect a change of control under applicable HEA regulations.

2.      Plaintiffs also seek from this Court an Order (a) appointing a Receiver to oversee all of the assets of ECA and to permit the operation of ECA's campuses in the ordinary course pending approval and implementation of ECA's restructuring plan and (b) entering a Temporary Restraining Order and Preliminary Injunction to enjoin, among other things, eviction proceedings and actions by creditors to enforce claims, rights and remedies against ECA and its assets, thereby preventing irreparable harm to ECA, its students and other stakeholders. The primary duties of the Receiver will be to effectuate (x) the restructuring and refinancing of certain institutions owned and operated by ECA so that those institutions may go forward with their educational missions (the "Go-Forward Schools") without interference from creditors, (y) the teach-out and closure of certain other institutions that will not go forward under the contemplated restructuring plan (the "Teach-Out Schools") and (z) the orderly administration of the resulting receivership estate for the benefit of ECA's creditors and other stakeholders.  The

Go-Forward Schools and the Teach-Out Schools are identified on **Exhibit 1** and **Exhibit 2**, respectively, attached hereto.

## II. PLAINTIFFS

3.      Plaintiff Education Corporation of America is a Delaware corporation with its principal place of business in Birmingham, Alabama.  Through the various campuses and online programs operated by its wholly owned subsidiaries described below, the ECA Institutions (defined below) offer programs of study culminating in diplomas and certificates, associate's degrees, bachelor's degrees, master's degrees, and doctorate degrees.  These programs are designed to equip students with specific skills that strengthen their ability to enter or advance in a chosen career.

4.      Plaintiff Virginia College, LLC, is wholly-owned by ECA and owns and operates 22 private institutions of higher education throughout the United States, comprising more than 70 campuses that serve nearly 20,000 students and provide qualified employees to businesses in their communities.  The 22 institutions, including all their associated campuses, are parties to program participation agreements with the DOE, and the DOE has assigned each institution an Office of Postsecondary Education Identification Number (an "OPE ID") that allows them to participate in the federal student financial aid programs under Title IV of the HEA ("Title IV programs").  Attached hereto as **Exhibit 3** is a list of all institutions and campuses owned and operated by Virginia College, LLC, including their OPE IDs.[1]

---

[1] Virginia College, LLC also owns (i) Culinard, LLC, an Alabama limited liability company, which owns and operates a restaurant in Mobile, Alabama, where the college's culinary students can complete externship training; and (ii) J.Y. Monk Real Estate Training Center, Inc., a North Carolina corporation that provides real estate training and certification courses at various locations in North Carolina. Culinard, LLC and J.Y. Monk Real Estate Training Center, Inc. are not parties to a program participation agreement with the DOE and do not receive funding under Title IV of the HEA.

5.      Plaintiff New England College of Business and Finance, LLC ("NECB") is also wholly-owned by ECA.  NECB is a Massachusetts limited liability company that operates an on-line college under its own OPE ID.

6.      The Virginia College, LLC, institutions and NECB (collectively, the "ECA Institutions") provide students with educational experiences and placement opportunities that are enhanced through a balance of general academics, technical skills, hands-on learning and personal growth.

7.      The goal of the ECA Institutions is to be responsible to their students, the technical and business communities and the general public.

### III. DEFENDANTS

8.      Defendant United States Department of Education is an executive agency of the United States government.   The DOE's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

9.      Defendant Elisabeth DeVos is the Secretary of the DOE.  Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

### IV. JURISDICTION AND VENUE

10.      There is subject matter jurisdiction under US CONST., art. III, § 2 and 28 U.S.C. § 1331, because this action involves the Higher Education Act of 1965, 20 U.S.C. § 1001 et seq. and 34 C.F.R. § 600.31(a)(1).   The HEA provides that federal courts have subject matter jurisdiction over actions against the Secretary of Education.   Section 1082(a)(2) of the HEA contains a "sue and be sued" clause that specifically mentions the federal courts:

(a) General powers.  In the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may […] (2) sue and be sued in any court of record of a State having general jurisdiction or in any district court of the United States, and such district courts shall have jurisdiction

of civil actions arising under this part without regard to the amount in controversy, and action instituted under this subsection by or against the Secretary shall survive notwithstanding any change in the person occupying the office of Secretary or any vacancy in that office; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control and nothing herein shall be construed to except litigation arising out of activities under this part from the application of sections 509, 517, 547, and 2679 of title 28 . . . . 20 U.S.C. § 1082(a)(2).

11.     This is an action against an officer and agency of the United States.  Venue is proper in this Court under 28 U.S.C. §§ 1391(e) because a substantial part of the events giving rise to this action took place in this judicial district and a substantial part of the property that is the subject of the action is situated in this judicial district.

12.     This Court is authorized to award the requested declaratory and injunctive relief, including monetary relief, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, the Administrative Procedures Act, 5 U.S.C. § 706, the Mandamus Act, 28 U.S.C. § 1361, the Higher Education Act, 20 U.S.C. § 1082 and this Court's inherent equitable powers.

## V. FACTUAL ALLEGATIONS

### A.    Background

13.     ECA's revenues flow almost exclusively from tuition and fees paid by its students at the ECA Institutions, a significant majority of whom utilize federal grants and student loans provided under the HEA to pay such tuition and fees.  Like most career colleges, ECA's student population largely comprises nontraditional students, such as unemployed or underemployed adults, who are seeking to obtain job skills in order to find employment or to change careers.

14.     Enrollment in many of ECA's campuses has been falling for several years.  The decline in enrollment can be attributed to numerous regulatory and macroeconomic factors, including: (a) the previous Administration's decision to remove the federal recognition of the

Accrediting Council for Independent Colleges and Schools ("ACICS"), the agency that accredits nearly all of the ECA Institutions, which required ECA to advise potential students of potentially dire consequences if ECA was unable to obtain alternate accreditation within a specified time frame, thereby causing some potential students to choose not to enroll or remain enrolled; and (b) the recent upturn in the business cycle that has lowered the unemployment rate to historic levels, so that more of the nontraditional students who typically enroll in the ECA Institutions are able to find employment without the need for more education or training.

**B.      Highly Regulated Environment**

15.      ECA Institutions and students are eligible for federal student aid programs under Title IV of the HEA.[2]

16.      ECA Institutions operate in a highly regulated environment. They are subject to oversight by various federal and state regulatory authorities including, most prominently, the DOE, as well as their accrediting agencies.

17.      The regulatory bodies that govern the Plaintiffs' operations, including but not limited to the DOE and the following State Authorities and Accrediting Agencies are aware of this receivership filing: Alabama Community College System; Arizona State Board of Private Postsecondary Education; California Bureau of Private Postsecondary Education; Colorado Division of Private Occupational Schools; Florida Commission for Independent Education; Georgia Nonpublic Postsecondary Education Commission; Indiana Board for Proprietary Education; Louisiana Board of Regents; Maryland Higher Education Commission; Massachusetts Department of Higher Education; Mississippi Commission for Postsecondary School and College Registration; Nevada Commission on Postsecondary Education; North Carolina Community College System; University of North Carolina Board of Governors; Ohio

---

[2] For the avoidance of doubt, Culinard, LLC, and J.Y. Monk Real Estate Training Center, Inc. are not so eligible.

State Board of Career Colleges and Schools; Ohio Department of Higher Education; Pennsylvania Board of Private Licensed Schools; South Carolina Commission on Higher Education; Tennessee Higher Education Commission; Texas Workforce Commission; Texas Higher Education Coordinating Board; State Council of Higher Education for Virginia; Accrediting Council for Independent Colleges and Schools ("ACICS"); and New England Commission on Higher Education, Inc. ("NECHE").

18.     The DOE regulates the ECA Institutions' participation in the federal student financial aid programs authorized under Title IV of HEA, as amended. The ECA Institutions'' participation in the Title IV programs enables their students to obtain federal student aid grants and loans. As is the case throughout contemporary higher education, many of these students would not be able to pursue postsecondary education without access to these funds.

19.     ECA has four campuses and a substantial portion of its corporate headquarters staff located in Alabama. There are approximately 1200 students pursuing academic programs across the four campuses, with approximately 500 students attending Go-Forward Schools and 700 students attending Teach-Out Schools. ECA has approximately 350 employees in Alabama directly supporting the students and campuses and another 150 employees with corporate and management responsibilities necessary to provide academic programs to almost 20,000 students across multiple states.

**C.     Financial Issues and Current State of Claims**

20.     Because ECA's revenues are produced almost entirely by tuition and fees paid by students at the ECA Institutions, the enrollment decline has negatively impacted ECA's financial condition and cash flow. ECA recently has not been able to timely service all of its financial obligations or timely meet its payables. ECA currently is generally not paying its debts as they

come due.  ECA has been focused on marshaling its dwindling financial resources to maintain its campuses and its educational programs and services for its students.

> **i.      ECA's Capital Structure**

21.      ECA's current financial obligations are as follows:

> *Monroe Credit Agreement*

A.      On October 15, 2018, Plaintiffs entered into that certain Eighth Amendment to the Credit Agreement (as amended time to time, the "Monroe Credit Agreement"), with Monroe Capital Management Advisors, LLC ("Monroe"), as administrative agent and collateral agent, and each of the lender parties thereto (the "Monroe Lenders").

B.      Under the Monroe Credit Agreement, the Monroe Lenders agreed to lend $16 million to ECA (as amended from time to time, the "Monroe Term Loan").  As of the commencement of these proceedings, the outstanding principal balance owing to the Monroe Lenders is $19 million.

C.      All obligations under the Monroe Credit Agreement are secured by a first priority security interest in all of ECA's assets, including all equity interests in the respective subsidiaries.

D.      In connection with entering into the Eighth Amendment, ECA and the Monroe Lenders provided a mechanism for a $12 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court and a second $7 million tranche of funding to be advanced to the ECA receivership estate upon approval by the Court.  Without having received funding on October 15, 2018, ECA would have been materially challenged to meet its payroll obligations during the week of October 15.

ECA anticipates that it will require additional capital of $12 million by the first week in November 2018 and additional capital of $7 million by the first week in December 2018. Thereafter, beginning in January 2019, ECA projects that it will operate on a cash flow positive basis as a result of operational changes and cost-cutting efforts that it has previously undertaken.

22.     As of October 5, 2018, ECA had unsecured debt owing to 1,033 vendors and landlords amounting to approximately $46,773,000.

### ii.     Plaintiffs' Landlord Obligations

23.     In the ordinary course of its business, the ECA Institutions lease and improve real estate to operate at their various campuses.  A list of the ECA Institutions'' leased real estate is provided in **Exhibit 4**, which is attached hereto and incorporated by reference herein.

24.     On or about September 10, 2018, ECA announced that it intended, in accordance with the expectations of the HEA, to discontinue new enrollments and to teach out the students already enrolled at 26 of its campuses, after which it intended to close the 26 campuses, the "Teach-Out Schools". The Teach-Out Schools remain vital assets of ECA, as the regulations governing teach-out processes require that the students be able to complete their degrees at the campus at which they are enrolled, unless sooner transferred.  While ECA seeks opportunities to transfer the students to alternate campuses or otherwise sooner fulfill its HEA requirements, there can be no assurance at this time that, without the contemplated restructuring plan, ECA will be able to transfer the students at Teach-Out Schools to other campuses, whether owned and operated by ECA or another institution, or that ECA will otherwise be able to mitigate its projected costs to complete the teach-out at each of the Teach-Out Schools.  Accordingly, ECA plans to remain in possession of most Teach-Out School campuses at least through December

2019 (ECA has made and is the process of making additional arrangements for students at several campuses to be transferred) and maintain its educational programs and services at those Teach-Out School Campuses through that date for the benefit of students, who are still enrolled at that time, subject to ECA's receivership estate's implementation of the contemplated restructuring plan to allow the administration of the Teach-Out Schools.

25.     ECA further intends to continue to operate each of the Go-Forward Schools, subject to the ECA's receivership estate's continued operation of the Go-Forward Schools.

26.     Several ECA campuses are presently the subject of landlord actions to recover on alleged claims for monetary judgments, which are ongoing, as well as to dispossess ECA from possession of such campuses, and ECA is a party to other ongoing commercial and employment litigation and arbitration proceedings with in excess of 70 landlords, vendors and other parties. Attached hereto as **Exhibit 5** is a list of litigation matters currently pending in which Plaintiffs and the ECA institutions are defendants. ECA has also received multiple notices of default, generally a precursor to a lawsuit or other enforcement of remedies, across its campuses.

27.     Plaintiffs' outstanding secured and unsecured obligations and lack of liquidity prohibit Plaintiffs from generally paying their obligations as they come due.  The projected costs and net revenues associated with the Teach-Out Schools, as well as the significant claims of landlords upon the termination of the Teach-Out School leases, will exacerbate Plaintiff's liquidity issues.  Further, pending lawsuits and other enforcement remedies threaten to strain Plaintiffs' ability to respond to claims of creditors.  Plaintiffs need to prevent a rush to judgment and enforcement of claims and remedies against Plaintiff and its assets, in order that the Receiver may run a marketing process to sell the financially viable Go-Forward Schools for maximum value while ensuring that the students in the Teach-Out Schools have an opportunity to complete

their programs. Without obtaining the relief requested herein, the unrestrained actions by ECA's creditors will almost certainly result in a disorderly and chaotic process that will irreparably harm students' interests and minimize recovery for all creditors.

### iii.     Regulatory Issues

28.     Following its review of ECA's fiscal year 2016 audited financial statements, the DOE in a letter dated October 18, 2017, calculated ECA's financial responsibility composite score ("Composite Score") as 1.2 and determined that ECA, therefore, failed to meet the financial responsibility standards outlined in 34 C.F.R. § 668.172.  As a result, ECA chose to continue to participate in the Title IV programs under the Zone Alternative described in 34 C.F.R. § 668.175.  Under the Zone Alternative, DOE placed ECA in provisional certification status and required ECA to make (a) Title IV program disbursements under the Heightened Cash Monitoring payment method; (b) mandatory notifications to the DOE should any one of a number of potential events occur; and (c) additional quarterly reports to the DOE about various financial and operational matters. The DOE notified ECA in a subsequent letter dated February 29, 2018, of additional financial and operational reporting requirements arising from its review of the fiscal year 2016 audited financial statements.

29.     ECA submitted its fiscal year 2017 audited financial statements to the DOE on or about June 28, 2018.  ECA simultaneously submitted to the DOE a Statement of Support explaining that certain extraordinary items and changes in accounting estimates should be considered when calculating ECA's 2017 Composite Score.  The DOE in August asked ECA to file voluminous operational and financing records to aid in its review of the fiscal year 2017 audited financial statements, and ECA filed extensive responsive documents in September 2018.

### iv.    Efforts to Fund Operations, Stabilize, and Facilitate a Sale

30.    Plaintiffs have limited options available but to seek the orderly restructuring of their operations and debts through a federal receivership, which is the only way in which they can preserve the ability of the Go-Forward Schools to serve their students and the Teach-Out Schools to fulfil their regulatory requirements to teach out the students, while also permitting Plaintiff's directors and officers to maximize the value of the ECA enterprise for the benefit of ECA's stakeholders.

31.    Without the protections provided by the creation of a receivership estate and the appointment of a receiver and the requested stay and injunction, ECA's institutions will not be able to complete the teach-out of the Teach-Out Schools or reorganize the Go-Forward Schools. Seeking protection in a traditional bankruptcy filing is not an option for ECA, because the HEA at 20 U.S.C. § 1002(a)(4)(A) specifically defines an "eligible institution" as one that, *inter alia*, has not filed for bankruptcy.  Any filing for bankruptcy therefore would immediately and permanently render ECA institutions ineligible to continue to participate in the federal student aid programs authorized by the HEA such that students enrolled at ECA institutions would no longer have access to federal loans and grants necessary to pay their tuition and fees.

### v.    Restructuring Plan in Principle

32.    ECA has determined that to operate successfully, it needs to close the 26 Teach-Out Schools and restructure its capital structure in order to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure and otherwise from its excessive overhead. ECA has worked diligently to shrink its overhead, but these savings alone are insufficient to turn the corner on ECA's ability to operate profitably.

33.     Under the proposed restructuring plan (the "Restructuring Plan"), the Monroe Lenders, or certain of them (in their capacity as a bidder for the assets of ECA, the "Stalking Horse") have offered to purchase the Go-Forward Schools and ECA's management platform free and clear of all claims, liens and encumbrances, pursuant to which ECA would transfer the Go-Forward Schools and management platform assets to the Stalking Horse, who will also pay the Teach-Out Schools' negative operating cash flow, ensuring the protection of the students' interests and facilitate the administration of the Teach-Out Schools.  The receivership estate would retain the Teach-Out Schools, which upon completion of the teach-out process would undergo an orderly windup in compliance with all state and federal laws and regulations and all accreditation requirements. In connection with the Restructuring Plan, the Plaintiffs have been in discussions with the Monroe Lenders regarding immediate, additional financing to fund the Plaintiffs operations and the Receiver's implementation of the Restructuring Plan.

34.     Plaintiffs request that the federal receivership estate comprise all assets, property rights and defenses. Plaintiffs further request that the Receiver be given broad authority over the receivership estate, similar to the role of a chief restructuring officer, leaving in place ECA's management and other employees to continue to operate the Business and ECA Institutions in the ordinary course, subject to the extant boards' and Receiver's direction, and to grant to the Receiver the power to direct restructuring transactions such as obtaining financing and selling ECA's assets.

35.     This Court would have national jurisdiction over all assets, by whomsoever held, wherever located within the United States, and the ability to channel all claims that have accrued as of the commencement of these proceedings, including without limitation, those against the

Teach-Out Schools and ECA directly, or as guarantor, into the receivership estate for an orderly and ratable distribution of the remaining assets to creditors.

**D.**   **Irreparable Harm Will Occur to Plaintiffs and Their Students Unless a Receiver Is Immediately Appointed and a Temporary Restraining Order and Preliminary Injunction Against Other Claims Is Entered**

36.    The immediate appointment of the Receiver and the entry of an injunction staying and barring creditors' claims and enforcement of remedies are necessary to prevent Plaintiffs and their students from suffering immediate and irreparable harm.  The creation of the ECA receivership estate is necessary to the orderly oversight and administration of the teach-out and delivery of educational programs to students enrolled at the Teach-Out Schools and, after closure of those campuses, the orderly disposition of their assets under the supervision of this Court. The entry of a Temporary Restraining Order and Preliminary Injunction, including an injunction against eviction proceedings, is necessary to prevent a race to attach and enforce rights against ECA and its assets, to the detriment of approximately 20,000 students.  Assuming the Court creates an ECA receivership estate and approves the Receiver to borrow additional funds from the Monroe Lenders, ECA projects that such additional funding will permit ECA to operate to a point in time when its operations will become cash flow positive, but ECA can reach this point only under the protection of receivership.

37.    Plaintiffs face imminent, irreparable harm due to their current financial vulnerability.  As set forth above, and attached as **Exhibit 5** to the Complaint, several of the Plaintiffs' campuses are presently the subject of landlord actions to dispossess ECA from possession of such campuses and to recover on alleged claims for monetary judgments, which are ongoing, as well as other pending and threatened commercial and employment litigation and arbitration proceedings to which ECA is a party.

38.     The immediate appointment of the Receiver and entry of an order restraining and enjoining creditors' claims and exercise of remedies will ensure that the Plaintiffs are able to operate the Teach-Out Schools through closure and to restructure their capital structure and attend to their debts in an orderly fashion to maximize enterprise value and permit the Go-Forward Schools to operate without the drag of the legacy claims of landlords and other vendors arising from the Teach-Out Schools' closure.

### E.     The Secretary of the DOE Will Not Suffer Harm Through the Appointment of the Receiver and the Entry of a Temporary Restraining Order and Preliminary Injunction.

39.     The Secretary of the DOE will not suffer any harm if the Receiver is immediately appointed and the Temporary Restraining Order and Preliminary Injunction are entered.  Instead, the goals and policies of the DOE and the Secretary will be fulfilled because the appointment of the Receiver and entry of the Temporary Restraining Order and Preliminary Injunction will protect students and minimize the disruption to their educational plans and, further, will allow the maintenance of the administrative structure that is necessary for ECA and the Receiver to properly manage and account for the use of all Title IV program funds that the DOE disburses to students throughout the receivership period.  Moreover, the Court's oversight through the appointment of the Receiver protect against the possibility that any school closes with a complete teach-out and orderly wind-down, thereby aiding the DOE by eliminating the need for the DOE to discharge potentially millions of dollars of Title IV program loans to students who are unable to complete their programs.

**F.    Public Policy Will be Served Through the Appointment of the Receiver and the Entry of a Temporary Restraining Order and Preliminary Injunction.**

40.    Public policy, as evidenced by the HEA, greatly favors protecting the Plaintiffs and their students. The Plaintiffs' student population largely comprises nontraditional students such as unemployed or underemployed adults, seeking to obtain job skills in order to find employment or to change careers. The immediate appointment of the Receiver and the entry of an Order restraining and enjoining other claims will ensure that Plaintiffs are able to fulfill the mission of educating students without the unnecessary and immediate disruption of the students' educational plans, and will assure the DOE that the institutions are in a position to continue to properly manage their Title IV program funds and provide services that avoid student loan discharges that would be a drain on the federal treasury.

## VI.  RELIEF REQUESTED

### COUNT I
### Declaratory Judgment

41.    Plaintiffs incorporate by reference, as if the same were fully set forth herein, the allegations contained in Paragraphs 1 through 40 of the Complaint.

42.    The Plaintiffs seek a judgment declaring that:

a.    The Restructuring Plan contemplated by ECA does not interfere with the ECA Institutions' or their students' ability to participate in funding programs under the HEA as provided in 20 U.S.C. § 1001 et seq.; and

b.    The appointment of a Receiver pending implementation of the Restructuring Plan contemplated by ECA does not constitute a change of control of the ECA Institutions under 34 C.F.R. § 600.31(a)(1).

## COUNT II
### Injunctive Relief

43.     Plaintiffs incorporate by reference, as if the same were fully set forth herein, the allegations contained in Paragraphs 1 through 42 of the Complaint.

44.     Plaintiffs are entitled to Injunctive Relief because (a) there is a strong likelihood that the Plaintiffs will succeed on the merits of their request for declaratory judgement; (b) the ECA Institutions and their students will suffer immediate and irreparable harm unless the requested Injunctive Relief is entered because the alleged claims described above from ECA's various creditors and vendors will interrupt and unnecessarily disrupt the Plaintiffs ability to operate the Teach-Out Schools through closure and to restructure their capital structure and attend to their debts in an orderly fashion under supervision of the Court; (c) the Secretary of the DOE will experience no harm if the Receiver is immediately appointed, whereas the Plaintiffs will suffer irreparable harm without the immediate appointment of the Receiver; and (d) the public interest weighs heavily in favor of appointing a Receiver to continue the educational mission of the Plaintiffs and their students and permit the ECA Institutions to comply with the HEA.

45.     Plaintiffs request that this Court enter an Order enjoining all parties holding claims against ECA, or any of its institutions or any of ECA's assets from asserting claims or continuing any process against ECA and its assets, enjoining:

(a)     The commencement or continuation, including the issuance, employment, or service of process, of a judicial, administrative, or other action or proceeding against ECA that was or could have been commenced before the entry of the order of appointment to recover a claim against the Debtors that arose before the entry of the order of appointment;

(b)     The enforcement or levy against ECA or any estate property of a judgment obtained before the order of appointment;

(c)     Any act to obtain possession of estate property from the Receiver or to interfere with or exercise control, over, estate property;

(d)     Any act to create, perfect, or enforce any lien or claim against estate property except by exercise of a right of setoff, to the extent that the lien secures a claim against the Debtors that arose before the entry of the order of appointment; or

(e)     Any act to collect, assess, or recover a claim against the Debtors that arose before the entry of the order of appointment; provided, however, that Plaintiffs do not seek to enjoin or otherwise interfere with the Department's or any accrediting agency's supervision of ECA and enforcement of applicable rules and regulations.

<u>**COUNT III**</u>
<u>**Appointment of a Receiver**</u>

46.     Plaintiffs incorporate by reference, as if the same were fully set forth herein, the allegations contained in Paragraphs 1 through 45 of the Complaint.

47.     This Court has the power to grant ancillary relief related to the federal question jurisdiction asserted above.

48.     This Court has the power to appoint a receiver whenever such appointment is deemed necessary.  Here, a federal receivership is warranted because (a) there is imminent danger that the ECA Institutions will cease to operate without the appointment of a receiver; (b) other legal remedies available to Plaintiff are inadequate; (c) there are no less drastic equitable remedies available to achieve Plaintiffs' goals; and (d) the failure to appoint a receiver will do more harm than good.

49.     Plaintiffs believe that the ECA Institutions and their students will suffer immediate and irreparable harm unless a receiver is immediately appointed to oversee and administer the closure and teach-out of the Teach-Out Schools and the orderly disposition of their assets under the supervision of this Court.  Plaintiffs believe and allege that any immediate financing is only available to the receivership estate, thereby sustaining the Stalking Horse's commitment to fund teach-out operating deficits. Plaintiffs believe and allege that such additional financing is sufficient to fund the teach-out to completion and on-going ordinary course operations of ECA pending the consummation of the sale of ECA's assets.

50.     Plaintiffs urge the Court for the immediate appointment of Sean M. Harding of FTI Consulting, Inc., to serve Receiver with the powers and authority described in the terms of the Emergency Motion for Appointment of Receiver and proposed order filed contemporaneously with this Petition.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in its favor and enter an Order:

(a)     Declaring that:

1.     The Restructuring Plan contemplated by ECA does not interfere with the ECA Institutions' and their students' ability to participate in funding programs under the HEA, as provided in 20 U.S.C. § 1001 et seq.;  and

2.     The appointment of a Receiver as described herein does not constitute a change of control of the ECA Institutions under 34 C.F.R. § 600.31(a)(1);

(b)     Enjoining:

1.     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding

against the Plaintiffs or their campuses or other assets that was or could have been commenced before the commencement of this case, or to recover a claim against the Plaintiff that arose before the commencement of this case;

2.　the enforcement, against the Plaintiffs or against property of the Plaintiffs, of a judgment or other consensual or nonconsensual lien obtained before the commencement of this case;

3.　any act to obtain possession of property of the Plaintiffs or to exercise control over property of the Plaintiffs, including, without limitation, the termination of any contract, agreement, license or right enjoyed by the Plaintiffs;

4.　any act to create, perfect, or enforce any lien against property of the Plaintiffs;

5.　any act to evict, exercise self-help or terminate any lease or occupancy agreement respecting any premises demised to or occupied or possessed by the Plaintiffs or any of their campuses;

6.　any act to collect, assess, or recover a claim against the Plaintiffs that arose before the commencement of this case appointment; provided, however, nothing in the Order shall be construed to enjoin or otherwise interfere with the Department's or any accrediting agency's supervision of ECA and enforcement of applicable rules and regulations; and

7.　the setoff of any debt owing to the Plaintiff that arose before the commencement of this case against any claim against the Plaintiff.

(c)     Appointing the Receiver to take possession of ECA's business and assets to oversee the administration of the closure of the Teach-Out Schools and to execute the restructuring plan outlined above or such other Restructuring Transactions that the Receiver determines to maximize the value of ECA for its stakeholders.

(d)     Awarding such other and further relief as this Court deems just and proper.

Dated:  October 16, 2018                    Respectfully submitted,

                                            By: _____
                                                Ollie A. "Tres" Cleveland, III
                                                J. Leland Murphree
                                                Ryan D. Thompson
                                                Maynard Cooper & Gale PC
                                                1901 6th Avenue North
                                                Suite 2400
                                                Birmingham, AL 35203
                                                Telephone: (205) 254-1000
                                                Facsimile: (205) 254-1999

                                                and

                                                Stuart M. Brown (*pro hac vice* forthcoming)
                                                DLA Piper LLP (US)
                                                1201 N. Market Street, Suite 2100
                                                Wilmington, DE 19801
                                                Telephone: 302.468.5700
                                                Facsimile: 302.778.7913

                                                Benjamin S. Boyd (*pro hac vice* forthcoming)
                                                DLA Piper LLP (US)
                                                500 Eighth Street, NW
                                                Washington, DC 20004
                                                Telephone: 202.799.4000
                                                Facsimile: 202.799.5000

                                                *Attorneys for Plaintiffs*

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL WITH COMPLAINT:**

United States Department of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

Betsy DeVos, in her official capacity as Secretary of Education
400 Maryland Avenue, S.W.
Washington, D.C. 20202

**PLEASE SERVE NON-DEFENDANTS VIA CERTIFIED MAIL WITH COMPLAINT:**

Civil-Process Clerk
United States Attorney's Office
Northern District of Alabama
1801 4th Avenue North
Birmingham, Alabama 35203

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001